IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No. 08-cv-02291-LTB-BNB

RICH FLOORS, LLC, and
DAVID SERVICK,

       Plaintiffs,
v.

JAYLON, INC., an Illinois corporation,
THORNTON LLC,

       Defendants,
v.

SUZANNE BLAIR,

       Third-Party Defendant.
_____

ORDER
_____

This matter is before me on a Motion for Summary Judgment filed by Defendants, Jaylon, Inc. and Thornton LLC, seeking judgment in their favor and against Plaintiffs, Rich Floors, LLC and David Servick, and against Third-Party Defendant, Suzanne Blair. [**Doc #35**]. Also before me is Defendants' related Motion to Strike Portions of Affidavits of David Servick and Eugene Chun as Incompetent Summary Judgment Evidence. [**Doc #58**]. Oral arguments would not materially assist me in the determination of these motions. After consideration of the parties' briefs and exhibits, I GRANT Defendants' motion for summary judgment. I DENY AS MOOT Defendants' motion to strike.

## I. BACKGROUND

On January 15, 2004, Plaintiff Rich Floors entered into an agreement with TSC Equities to lease Suite No. 831-1 at the Thornton Shopping Center for a term of 61 months for its flooring business. Plaintiff David Servick, the managing member of Rich Floors, and Third-Party Defendant Suzanne Blair personally guaranteed Rich Floors' obligations under the lease.

After signing the lease, Rich Floors began to operate a U-Haul business out of the premises in September of 2004. Thereafter, on or about May 9, 2005, Defendant Thornton LLC purchased the Thornton Shopping Center from the prior owner, TSC Equities.

On November 14, 2005, Defendant Jaylon, as Thornton LLC's property managing agent, sent Rich Floors a letter indicating that its U-Haul vehicles should not be parked in front of the Thornton Shopping Center, but instead must be stored in the parking lot adjacent to the store occupied by Rich Floors. Over the next few years, the parties continued to discuss how and where the U-Haul vehicles should be parked. Ultimately, on December 31, 2007, Defendants sent a letter to Rich Floors indicating that it needed to execute an amendment to the lease related to the U-Haul business, or Thornton would tow the U-Haul vehicles. The parties engaged in further negotiations, which again were not successful.

Ultimately, on April 2, 2008, Thornton had three U-Haul vehicles towed from the shopping center. Nine days later, on April 11, 2008, the electric and gas utilities to the premises were turned off by the supplier, XCel Energy. Five days later, on April 16, 2008, Plaintiff Servick was injured after he tripped and fell on inventory while attempting to vacate the premises. On May 12, 2008, Plaintiffs sent the keys to the premises to Defendants via counsel.

Plaintiffs filed this lawsuit on May 28, 2009, asserting a claim for constructive eviction and a claim for personal injury against Defendants. In response, Defendants assert counterclaims against Plaintiffs Rich Floors and Servick for breach of lease and indemnification, and assert claims of breach of guaranty against Plaintiff Servick and against Third-Party Defendant Suzanne Blair. This lawsuit was initially filed in state court, but then was removed to this court on the basis of diversity jurisdiction pursuant to 28 U.S.C. §1332. It is undisputed that Colorado law controls this dispute.

## II. MOTION FOR SUMMARY JUDGMENT

In their motion seeking summary judgment, Defendants first assert that Plaintiffs' claims against them should be dismissed on the basis that the claims are precluded by the terms of the lease and, in addition, they seek entry of judgment in their favor on their counterclaims. The purpose of a summary judgment motion under Fed. R. Civ. P. 56 is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary judgment is appropriate if the record reveals that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When applying this standard, I examine the factual record in the light most favorable to the party opposing summary judgment, extending to that party all reasonable factual inferences. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the movant carries its burden of showing the absence of a genuine issue of material fact, the non-movant must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir.

1992). An issue of material fact is genuine if a reasonable factfinder could return a verdict for the non-movant. *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996).

**A. Plaintiffs' Constructive Eviction Claim**

In Plaintiffs' First Claim for Relief, they allege that Defendants "constructively evicted" Rich Floors from the premises at the Thornton Shopping Center by first having its U-Haul vehicles towed on April 2, 2008, and then causing the utilities to be turned off on April 11, 2008.

Under Colorado law, a constructive eviction is any disturbance of the tenant's possession by the landlord that renders the premises unfit for occupancy for the purposes for which they were leased, or that deprives the tenant of the beneficial enjoyment of the premises, causing the tenant to abandon the premises. 2A Colorado Practice Series § 71.5, Actual and Constructive Eviction (2009); *see also Radinsky v. Weaver,* 460 P.2d 218, 220 (Colo. 1969). A constructive eviction that terminates a lease is defined as a willful act by the landlord that materially disturbs the possession of the tenant. *See Deeb v. Canniff,* 488 P.2d 93, 95 (Colo. App. 1971); 10 Colorado Practice Series § 8.33, Constructive Eviction (2009).

**Towing Incident**

In this motion, Defendants first argue that the towing of Plaintiffs' U-Haul trucks on April 2nd did not, as a matter of law, constitute a constructive eviction. Defendants maintain that under the lease it had the sole and exclusive jurisdiction of the common areas, including the parking lots; that it warned Rich Floors that parking the U-Haul vehicles on the property was in violation of lease; and that the towing did not make the premises unfit for occupancy or impair Plaintiffs' ability to use the premises.

4

Plaintiffs do not dispute that the lease provides that Defendants retained sole and exclusive control of the common areas, and that use of the common areas was "subject to such Rules and Regulations as Landlord may from time to time establish for the use of such common areas by tenants of the Center." (Section 10(c)). The Rules and Regulations portion of the lease provides, in pertinent part, that:

> Control of Common Areas. Landlord shall at all times have the sole and exclusive control of the Common Areas, and may at any time and from time to time during the term hereof exclude and restrain any person from use or occupancy thereof, excepting, however, bona fide customers, patrons and service suppliers of Tenants who make use of Common Areas in accordance with these Rules. (Rules and Regulations, § 7).

However, Plaintiffs assert that the ability to conduct its U-Haul business – and, as such, park the U-Haul trucks at the property – was a lease hold right. They concede that under a section of the lease entitled "Use," Rich Floors agreed to use the premises "only for sale of flooring and related items and for no other purposes whatsoever without the prior written consent of Landlord" (Section 5(a)(emphasis in original)). However, Plaintiffs maintain that after they signed the lease, the previous landlord had orally agreed to allow them to operate a U-Haul business out of the premises.

For the purpose of this motion Defendants do not dispute or challenge this asserted fact, but instead argue that any such oral modification is foreclosed by both the express terms of the lease – which does not permit a modification of use except with "prior *written* consent" [Section 5(a)] and the integration provision which provides that "[n]o oral statements ... not specifically incorporated herein shall be of any force or effect" and "[t]his lease shall not be modified except by a written agreement executed by both parties hereto" [Section 35] – and by the "Tenant

Estoppel Certificate" executed by Plaintiffs after the alleged oral modification – which indicated that "the Lease has not been modified, altered or amended and there are no oral or other written agreements or understandings . . . relating to the Premises."

In *Vu, Inc. v. Pacific Ocean Marketplace, Inc.*, 36 P.3d 165, 167-68 (Colo. App. 2001), a division of the Colorado Court of Appeals held that an alleged oral modification of a commercial lease could not be enforced against a successor landlord. In that case the tenant brought suit after its new landlord rented space to the tenant's competitor. The tenant argued, like Plaintiffs do here, that its prior landlord had orally agreed to a use that was not contained within the written agreement that, in turn, bound the current landlord. In upholding the trial court's summary judgment ruling in favor of the landlord, a division of the Colorado Court of Appeals first found that the unambiguous language in the lease did not provide the tenant with such a right. And, moreover, the delivery of a tenant estoppel certificate – stating that all rights and obligations of the parties were only those contained in the lease agreement and that the "lease agreement represents the entire agreement between the parties"– prevented the tenant from claiming that a different set of facts existed than those mentioned in the certificate. *Id.* at 167. In so ruling, the division relied on the rationale of *Sports World, Inc. v. Neil's Sporting Goods, Inc.*, 507 So.2d 480 483 (Ala. 1987), which "suggests not only that candor and fair dealing should prevail in transactions concerning leases, but also that oral agreements that affect the rights of parties to a written agreement should, themselves, be put in writing so that fair, actual notice is given to all parties to the lease . . . [f]ailure to commit such oral agreements to writing properly bars their enforcement, and excuses any duties or obligations that would accrue to others had actual notice of the oral agreement been given." Thus, the Court determined that:

> [b]y presenting [the landlord] with the estoppel certificate, and by failing to commit any alleged oral agreement to writing, tenant ratified the prior lease agreement and did not add any additional terms, including any mention of the oral agreements it now contends were a part of the original contract. These acts, and failures to act, excused any duties that would have accrued to [the landlord] if notice had been given and made any inquiry by [the landlord] beyond the terms and conditions of the lease agreements unnecessary. Thus, we conclude that the trial court did not err in refusing to enforce the alleged oral agreement.

*Vu v. Pacific Ocean Marketplace*, *supra*, 36 P.3d at 168.

Plaintiffs argue that the ruling in *Vu v. Pacific Ocean Marketplace, supra,* is distinguishable and not applicable to the facts here. Specifically, they assert that the estoppel certificate in this case was executed for a lender – in connection with the prior landlord's financing – and was not intended for Defendants' use; Defendants' had notice of the oral agreement at the time they purchased the shopping center; and the oral agreement was subsequently ratified by Defendants' performance after purchasing the shopping center. I am not persuaded by Plaintiffs' arguments.

The applicable language in the lease provides that it may only be modified by writing. However, Colorado law provides that a subsequent oral agreement between the parties *may* modify a provision of an earlier written contract, even in the face of a provision in the original contract that modifications must be in writing. *See Agritrack, Inc. v. DeJohn Housemoving, Inc*. 25 P.3d 1187, 1193 (Colo. 2001)(*citing James H. Moore & Assocs. Realty v. Arrowhead at Vail,* 892 P.2d 367, 372 (Colo. App. 1994)).

But assuming, *arguendo*, that the there is sufficient evidence of such modification, Plaintiffs have not referred me to any authority for the legal proposition that an estoppel certificate only binds a tenant for the underlying reason it was executed. In fact, the lease

7

specifically provides that upon the landlord's request, the tenant must execute a tenant estoppel certificate certifying, among other things, that the lease is "unmodified." And "[a]ny such statement may be relied upon by a purchaser, assignee or lender." [Section 36] As such, Plaintiffs' averment in the certificate that "the Lease has not been modified, altered or amended and there are no oral or other written agreements or understandings . . . relating to the Premises" is applicable and controls in this case. As in *Vu v. Pacific Ocean Marketplace*, *supra*, 36 P.3d at 168, by failing to commit the oral agreement to writing and then signing the estoppel agreement, Plaintiffs here "ratified the prior lease agreement and did not add any additional terms, including any mention of the oral agreements it now contends were a part of the original contract."

Finally, I also reject Plaintiffs' assertion that Defendants had notice of the oral agreement – in that it was aware of Plaintiffs' use of the premises as a U-Haul dealership both before and after it purchased the Thornton Shopping Center – and then subsequently ratified that agreement. Plaintiffs' argument that Defendant ratified or waived the lease requirement regarding use of the premises or the use of the common areas is foreclosed by Section 22 of the lease, which provides that "[n]either failure on the part of either party to complain of any action or non-action on the part of the other or to declare the other in default, no matter how long such failure may continue, nor acceptance of Rent, or other sums from Tenant after any such breach, shall be deemed to be a waiver by either party of any of its rights hereunder."

So, under the undisputed facts and the language of the lease, Plaintiffs cannot prove, as a matter of law, that the towing of the U-Haul vehicles constituted a constructive eviction.

8

**Utilities Incident**

Defendants also assert that the disruption of power service to the premises on April 11th did not, as a matter of law, constitute a constructive eviction. I agree.

First, I reject Plaintiffs' argument to the extent that they assert that the lease agreement was orally modified, at the time of its execution, in that its prior landlord agreed to pay all the utilities provided to the premises. "[P]arol evidence may not be admitted to add to, subtract from, vary, contradict, change, or modify an unambiguous integrated contract." *Boyer v. Karakehian,* 915 P.2d 1295, 1299 (Colo. 1996); *Buckley Bros. Motors, Inc. v. Gran Prix Imports, Inc.,* 633 P.2d 1081, 1083 (Colo. 1981). Extrinsic evidence of course of performance is likewise admissible only if it does not directly contradict the terms of a written agreement but merely explains or supplements it. *See Morgan County Feeders, Inc. v. McCormick,* 836 P.2d 1051, 1055 (Colo. App. 1992)(*citing Great Western Sugar Co. v. Northern Natural Gas Co.,* 661 P.2d 684 (Colo. App. 1982)). Finally, an integration clause also precludes consideration of extrinsic evidence to ascertain the intent of the parties. *Nelson v. Elway,* 908 P.2d 102, 107 (Colo. 1995). Hence, Plaintiffs' contention that the terms of the lease were that the landlord was to pay all the utilities provided to the premises – as was allegedly orally agreed to at the time the lease was signed – is not relevant to my consideration here.

Plaintiffs' constructive eviction claim is premised on its assertion that Defendants were responsible for the termination of utilities to the premises on April 11th. The lease provides, however, that "Landlord shall not be responsible for any interruption in utility services." [Section 8] Plaintiffs do not argue that this provision in the lease is ambiguous or inapplicable. Rather, they maintain that the provision – as an "exculpatory clause" – is not valid under

9

Colorado law, and that it is unenforceable because there is evidence that the harm was caused by Defendants' intentional conduct.

Under Colorado law, the following factors are relevant when determining whether an exculpatory agreement is valid: (1) consideration of the public policy implications of the subject matter involved (whether it concerns a duty to the public and whether the type of services performed affects the public interest) and (2) the circumstances of the specific contract (whether the contract was fairly entered into and whether the parties' intentions were expressed in clear and unambiguous language). *Stanley v. Creighton Co.,* 911 P.2d 705, 706-07 (Colo. App. 1996). The determination of the validity of an exculpatory clause is a question of law for the court. *Id; Jones v. Dressel*, 623 P.2d 370 (Colo. 1981).

The exculpatory provision in this commercial lease does not implicate public policy issues. Its purpose is to protect a commercial landlord from disruption in utilities service from possible resulting damages to its individual tenants; it does not implicate a duty to the public, nor does it affect the public interest. Moreover, the provision is clear and unambiguous. The lease was entered into by a sophisticated business party who was represented by legal counsel. As a result, I conclude that the lease provision at issue here, which provides that a landlord of a commercial shopping center cannot be responsible for utility service interruptions, is a valid exculpatory clause under Colorado law. *See e.g. Mincin v. Vail Holdings, Inc.*, 308 F.3d 1105, 1110 (10th Cir. 2002); *Stanley v. Creighton, supra,* 911 P.2d at 708.

Plaintiffs further argue that even if the clause is valid, it cannot be enforced against them because there is sufficient evidence to raise a genuine issue of material fact that Defendants acted willfully and intentionally by actively having the utilities to the premises shut off. *See*

*generally Rhino Fund, LLLP v. Hutchins,* 215 P.3d 1186, 1191 -1192 (Colo. App. 2008)(*citing Jones v. Dressel, supra,* 623 P.2d at 376)("[a]n exculpatory agreement, which attempts to insulate a party from liability from his own negligence, must be closely scrutinized, and in no event will such an agreement provide a shield against a claim for willful and wanton negligence.")

However, even assuming that Defendants acted in an intentional manner to have the utilities turned off, Plaintiffs cannot prove that the interruption in utilities caused them to "abandon the premises" in order to sustain a claim for constructive eviction. It is undisputed that the day after the U-Haul trucks were towed, but before the utilities were shut off, Plaintiffs' counsel sent an email to Defendants' counsel stating:

> At this time, Rich Floors will be looking to vacate the premises, since it cannot do the business for which the premises were intended. We expect that the size of the inventory currently on hand which my client can not sell at its ordinary fair market value, because of the actions of the landlord and the destruction of the sign, will mean that it will take at least 90 days to liquidate. If your client finds a new tenant sooner, then please advise.

The email also stated that Defendants had a duty to mitigate its damages, including making "active efforts to pursue a substitute tenant for the premises." Six days later, counsel sent another email, dated April 9th, again indicating that it will take "approximately 90 days to shut down [and] I would suggest your client begin the mitigation process forthwith." These communications were sent before the utilities were shut off. Directly after the utilities were disconnected, Plaintiffs began liquidating inventory in order to vacate the premises. Plaintiffs officially surrendered the premises on May 12, 2008, when it sent the keys to Defendants via counsel. The term of the lease was through March of 2009.

11

An anticipatory repudiation of a contract occurs upon a party's definite and unequivocal manifestation of its intention that it will not perform as required by the contract. *Highlands Ranch University Park, LLC v. Uno of Highlands Ranch, Inc.*, 129 P.3d 1020, 1023 (Colo. App. 2005)(citations omitted). Plaintiffs do not dispute the relevant facts, but rather maintain that a fact finder could conclude that the email communications were not definite. I disagree.

Under Colorado law, the intent to repudiate cannot be merely a "threat to abandon contract obligations," but rather must "reflect an unequivocal refusal to perform the agreement, specifically an overt refusal to perform various enumerated contractual obligations." *Lawry v. Palm*, 192 P.3d 550, 558 (Colo. App. 2008)(*citing Lake Durango Water Co. v. Pub. Utils. Common*, 67 P.3d 12, 21 (Colo. 2003)); *Quinn v. City of Evans Police Dept.*, 2009 WL 2241955 (D.Colo. 2009)(not selected for publication). "A repudiation occurs when a party to a contract makes 'an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance.'" *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1014 (10th Cir. 2002)(*quoting* U.C.C. § 2-610 cmt. 1 (1989)).

Here, as in *Highlands Ranch v. Uno, supra,* 129 P.3d at 1023, the tenant unequivocally reported that it would not perform under the lease and informed the landlord that it should seek another tenant. Plaintiffs' counsel's emails consist of statements that clearly evidenced Plaintiffs' definite intent to vacate the premises before the end of the term of its lease and, as such, amounted to an anticipatory repudiation or renunciation of the lease as a matter of law. *Id.* Moreover, this intent was clearly supplemented by Plaintiffs' subsequent actions in vacating the premises and returning the keys. *See Lawry v. Palm, supra,* 192 P.3d at 559 (finding that even if the e-mail communications themselves were not sufficient to establish repudiation, they were

12

supplemented by the defendant's breach by nonperformance, *citing Restatement* (Second) of Contracts § 250 cmt. b). Although "[a] determination of whether an anticipatory repudiation has occurred is 'ordinarily' a question of fact, when there is no genuine issue of material fact as to the statements and correspondence exchanged between the parties," as here, summary judgment may be appropriate. *See Quinn v. City of Evans Police Dept.*, *supra*, 2009 WL 2241955.

Because I conclude that Plaintiffs have not brought forward specific facts showing a genuine issue for trial as to its constructive eviction claim – either for the April 2nd towing of Plaintiff's U-Haul trucks or the disruption of power service to the premises on April 11th – Defendants are entitled to summary judgment on that claim as a matter of law.

**B. Plaintiff's Personal Injury Claim**

Defendants also seek summary judgment in their favor on Plaintiffs' claim against them for damages related to the personal injuries Plaintiff Servick received when he fell while vacating the premises. In their complaint, Plaintiffs assert that after the utilities were shut off, Plaintiff Servick "tripped and fell over other inventory that was in the premises, causing at least a tear to the muscle in his arm" and "but for the electricity being turned off at the premises, Servick would not have tripped and fallen and torn the muscle in his arm."

Defendants maintain that this personal injury claim is precluded, as a matter of law, by Section 17 of the lease in which Plaintiffs agreed to indemnify and ". . . save harmless Landlord [and its . . . "Indemnitees"] from and against any and all liabilities, losses, expenses, damages, claims, suits, costs and causes of action of any kind whatsoever arising or alleged to arise in whole or in part by or from . . . (iii) any accident, injury, death or damage whatsoever or howsoever caused to any person, or any property, occurring in, on or about the Leased Premises

13

REGARDLESS OF WHETHER OR NOT SUCH LIABILITIES, DAMAGES, CLAIMS, SUITS, COSTS, ACCIDENTS, INJURIES, OR DEATHS ARE CAUSED BY OR ATTRIBUTED TO THE NEGLIGENCE OF INDEMNITEES." (Emphasis in original). However, this indemnity "shall not include or cover such liabilities, damages, claims, suits, costs, accidents, injuries or deaths to the extent that they are found by final judgment of a court of competent jurisdiction to have been caused by or attributed to the gross negligence or willful misconduct of the applicable indemnitee."

In response, Plaintiffs argue that they have propounded sufficient evidence for a factfinder to conclude that Defendants' actions in having the utilities turned off were intentional and constituted "gross negligence and willful misconduct." Gross negligence and willful misconduct is "[t]he intentional failure to perform a manifest duty in reckless disregard of the consequences or in callous indifference to the life, liberty or property of another [which] may result in such a gross want of care for the rights of others and the public that a finding of a willful, wanton, deliberate act is justified." *Palace Exploration Co. v. Petroleum Development Co.*, 374 F.3d 951, 954 (10th Cir. 2004); *see also Castaldo v. Stone*, 192 F.Supp.2d 1124, 1140 (D. Colo. 2001); *White v. Hansen,* 837 P.2d 1229 (Colo. 1992); C.J.I. § 9:30 (2009).

Plaintiffs' evidence that Defendants wilfully acted to have the utilities turned off at the premises is as follows. First, Plaintiffs maintain that it is undisputed that the lease required that the landlord pay the electricity supplied to the premises. Plaintiffs argue that when Defendants attempted to charge them for water service in September 2005, Plaintiff Servick responded that he had understood that the rent included all utilities. Then, after this conversation, Defendants did not attempt to charge Plaintiffs for any utilities. Furthermore, because there was no meter at

14

the shopping center with a service address that corresponded to the premise's street address, Plaintiffs speculate that it "must have been obvious" to Defendants that they were paying the utility bill for the wrong service address. In October of 2007 – shortly after Defendants were required to repair a remote parking lot following a complaint by Plaintiffs about the condition of the lot to the City of Thornton – Defendants arranged for the account on utilities meter #8856 at the shopping center to be transferred from them to a new tenant. Plaintiffs further speculate that the close temporal proximately between the complaint about the parking lot and the transfer of the account "*might* suggest to a fact finder that . . . [Defendant] was taking advantage of the erroneous service addresses to retaliate against [Plaintiffs] for complaining about the condition of the remote parking lot." (Emphasis added). Thereafter, in January of 2008, a representative of that new tenant, Eugene Chun, informed Defendants that they were receiving utility bills for meter #8856, but that the bills were not their responsibility. Mr. Chun gave Defendants the unpaid bills along with a letter from an electrician stating that meter #8856 did not supply utility services to the new tenant. Plaintiffs assert that even if the account was transferred by mistake, as Defendants claim, based on this evidence the "news that Rich Floors' power had been cut off on April 11, 2008 due to nonpayment of the bills would have been sufficient to alert any cognitively adequate person that these bills were for the services supplied to Rich Floors and that it was the landlord's failure to pay these bills that resulted in the interruption of the utilities."

Even when this evidence is assumed to be true and the inferences from it are made in favor of Plaintiffs, such evidence is insufficient to establish a genuine issue for trial of intentional and thus gross negligence or willful misconduct by Defendants to negate the otherwise valid and unambiguous lease provision that "[l]andlord shall not be responsible for

any interruption in utility services." Defendants have brought forth significant evidence that they did not act to have Xcel shut off the utilities to the premises. In addition, the inferences that Defendant put meter #8856 in the wrong name based on the temporal proximately with Servick's complaint about the parking lot, or that Defendants must have known that the shut off was due to its failure to pay the utility bills on that meter are too attenuated to raise a disputed issue to the factual determination that Defendant acted intentionally to have the utilities turned off to the premises. I conclude that Plaintiffs have not meet their burden of identifying sufficient specific facts to establish a genuine issue for trial of intentional acts by Defendants to negate the lease provision that "[l]andlord shall not be responsible for any interruption in utility services." *See generally Anderson v. Liberty Lobby, supra*, 477 U.S. at 250 ("[t]he relevant question for the trial judge is whether the evidence is so one-sided that a reasonable jury could only arrive at one conclusion").

## C. Defendants' Counterclaims

In addition to seeking dismissal of Plaintiffs' claims, Defendants also seek summary judgment in its favor on its counterclaims for breach of contract against Plaintiff Rich Floors and breach of guaranty and indemnification against Plaintiff Servick and Third-Party Defendant Blair.

Defendants assert that they are entitled to summary judgment on their counterclaim for breach of contract because there is no factual dispute that Rich Floors breached the lease by vacating the premises before the expiration of the lease term, and in failing to pay rent after April 4, 2008, pursuant to Section 20 of the lease. *See Western Distributing Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992)(discussing breach of contract elements). As such, Defendants claim

16

that Rich Floors owes past due rent in the principal amount for $52,574.50, late charges in the amount of $2,628.93, pre-judgment interest, attorney fees and costs.  Defendants also claim that they are entitled to $1,700.00 in costs incurred in attempting to re-let the premises, as well as the amount it inadvertently paid to Xcel Energy for gas (but not electric) services provided to the premises from June 2005 to October 2007 in the approximate amount of $23,240.00.  Likewise, Defendants maintain that there is no factual dispute that Plaintiff Servick and Third-Party Defendant Blair personally guaranteed Rich Floors' obligations under the lease.  Hence, Defendants also argue that they are entitled to judgment, as a matter of law, on their breach of guaranty claims.

In their response to the motion, Plaintiffs do not directly challenge or disagree with Defendants' claim that they are entitled to summary judgment on their counterclaims.  Instead, Plaintiffs rely upon their arguments in support of their assertion that Defendants are not entitled to summary judgment on their claims for constructive eviction and personal injury.  Nor do they dispute the claimed amounts.  As a result, Plaintiffs have failed to meet their summary judgment burden to bring forward evidence or specific facts showing a genuine issue for trial.  Therefore, Defendants are entitled to summary judgment on their breach of contract counterclaim against Plaintiffs, and their breach of guaranty counterclaims against Plaintiff Servick and Third-Party Defendant Blair.  *See Reed v. Bennett*, 312 F.3d 1190, 1194-95 (10th Cir. 2002)(explaining implications of a party's failure to respond to a summary judgment motion); Fed.R.Civ.P. 56(e)(2)("when a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must-by affidavits or as otherwise provided in this rule-set out specific facts showing a genuine

issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.")

Finally, Defendants argue that Plaintiff Servick and Third-Party Defendant Blair agreed in the lease to indemnify and defend Defendants with respect to Plaintiff Servick's personal injury claim under Section 17, which provides that Rich Floors must indemnify, defend and save harmless Defendants from "any accident, injury, death or damage whatsoever and howsoever caused to any person, or any property, occurring in, on or about the Leased Premises." In light of my ruling that Defendants are entitled to summary judgment on Plaintiffs' personal injury claim – in that Plaintiffs have failed to set forth sufficient evidence of wilful/intentional conduct by Defendants to negate the indemnification clause in the lease – I conclude that Defendants are entitled to judgment on their indemnification counterclaim in which they seek indemnification for all damages awarded to Plaintiff Servick on his personal injury claim.

### III. MOTION TO STRIKE

Finally, I address Defendants' motion to strike affidavit evidence filed by Plaintiffs in response to their motion for summary judgment. Specifically, Defendants object to certain exhibits and statements contained in affidavits filed by David Servick and Eugene Chun that they argue consist of incompetent summary judgment evidence, including: conclusory and self-serving statements, inadmissible hearsay, statement of speculation or belief, and statements made without the personal knowledge of the affiant. As such, Defendant ask that I strike the incompetent evidence pursuant to Fed. R. Civ. P. 12(f) and 56(e). *See generally Argo v. Blue Cross and Blue Shield of Kansas, Inc.,* 452 F.3d 1193, 1199 (10th Cir. 2006).

I did not apply or consider the complained-of affidavit evidence when ruling on the motion for summary judgment. The evidence at issue was either inconsequential or irrelevant to my determinations. As a result, I deny as moot Defendants' motion seeking to strike portions of the Servick and Chun Affidavits as incompetent summary judgment evidence. *See e.g. Ortiz v. San Miguel County,* 955 F.Supp. 1338, 1347 (D. N.M. 1996)(denying as moot the defendants' motion to strike affidavit evidence "because the Court did not need to rely on [the affidavit] in denying that portion of Defendants' motion for summary judgment to which [it] might have been relevant").

ACCORDINGLY, I GRANT Defendants Jaylon, Inc. and Thornton LLC's Motion for Summary Judgment [**Doc #35**], as follows:

1) Defendants' request seeking judgment in its favor on Plaintiffs Rich Floors, LLC and David Servick's claim against them for constructive eviction and for personal injuries is GRANTED. As a result, Plaintiffs' complaint is DISMISSED;

2) Defendants' request seeking judgment in its favor on its counterclaims for breach of contract against Plaintiffs and breach of guaranty against Plaintiff Servick and Third-Party Defendant, Suzanne Blair, is GRANTED;

3) Defendants' request seeking judgment in its favor on its counterclaim for indemnification against Plaintiffs and Third-Party Defendant is GRANTED;

4) FINAL JUDGMENT SHALL ENTER in favor of Defendants on all of Plaintiffs' claims and in favor of Defendants against Plaintiff Rich Floors, LLC, on their First Counterclaim (Breach of Lease) in the following amounts: past due rent in the principal amount of $52,574.50,

late charges in the amount of $2,628.73, reimbursement for the gas services Defendants inadvertently paid in the estimated amount of $23,240, $1,700 to re-let the premises, pre-judgment interest on these amounts, post-judgment interest on these amounts, and attorneys' fees and costs, and against Plaintiff David Servick and Third-Party Defendant Suzanne Blair on their Third Counterclaim (Breach of Guaranty) in the following amounts: past due rent in the principal amount of $52,574.50, late charges in the amount of $2,628.73, reimbursement for the gas services Defendants inadvertently paid in the estimated amount of $23,240, $1,700 to re-let the premises, pre-judgment interest on these amounts, post-judgment interest on these amounts, and attorneys' fees and costs; and

    5) Defendants are awarded their costs.

In addition, I DENY AS MOOT Defendants' Motion to Strike Portions of Affidavits of David Servick and Eugene Chun as Incompetent Summary Judgment Evidence [**Doc #58**].

Dated: April   5  , 2010, in Denver, Colorado.

                                            BY THE COURT:

                                              s/Lewis T. Babcock
                                            LEWIS T. BABCOCK, JUDGE